# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARVIN LAMONT DORSEY     *

Petitioner     *

v.     *    Civil Action No. JKB-12-1243

BOBBY P. SHEARIN, *et al.*     *

Respondents     *

      ***

## <u>MEMORANDUM</u>

Respondents' answer to the above-captioned petition for writ of habeas corpus and petitioner's reply thereto have now been filed, together with exhibits.  Accordingly, the petition is ripe for consideration.  ECF No. 11 and 14.  The court finds no need for an evidentiary hearing.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2011);  *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)).

### Background

On January 26, 2006, petitioner Marvin Dorsey ("Dorsey") was convicted by a jury in the Circuit Court for Baltimore City of the first-degree murder of Raymond Savoy, use of a handgun in a crime of violence, and carrying a handgun. ECF No. 11 at Ex. 7, pp. 52 – 53.  On April 17, 2006, after a motion for new trial was denied, Dorsey was sentenced to serve life in prison on the murder count plus a consecutive twenty-year term for the handgun offenses.  *Id*. at Ex. 8, pp. 23 – 25.  Evidence produced at trial consisted largely of eyewitness testimony and is summarized below.

Bonnie Banks testified that she observed Dorsey on October 27, 2004, at approximately 4:00 p.m., come out of a house "a couple of doors away from where [she] was standing . . . with his hand down in his pants." ECF No. 11 at Ex. 5, p. 48. She identified Dorsey in the courtroom as the man she saw and stated that she had seen him on prior occasions, including earlier that day in a store. She recalled commenting that his eyes "were nice" because of their gray color. *Id*. at pp. 48 – 49. Banks further testified that Dorsey was walking at a fast pace in the direction of Caroline Street. Shortly after he passed Banks, she heard shots fired. *Id*. at pp. 49 – 50. Immediately after hearing the shots, Banks observed Dorsey walking quickly back to the house he had left earlier, again with his hand in the waistband of his pants. *Id*. at p. 51. Banks further testified that the house, from which Dorsey left and returned, belonged to his mother, who ran a day-care center out of it. *Id*. In the aftermath of the shooting, Banks testified she heard people screaming and that there were children coming home from school, standing on the curb with their parents. *Id*. at p. 52. She walked to the scene of the shooting and from a distance of approximately 25 to 30 feet saw the victim lying on the ground in a pool of blood. *Id*. at pp. 53 – 54. Banks later identified Dorsey in a photo array consisting of six photographs shown to her by the police in April of 2005. *Id*. at pp. 54 – 59. Following Banks's testimony, the prosecution moved to have Dorsey approach the jury so they could observe the color of his eyes. *Id*. at pp. 63 – 64. Dorsey's counsel made no objection to the motion. *Id*. at p. 64.

Lorceeces Cannimore was engaged in a conversation with Raymond Savoy when he was shot and killed. She testified that she had known Dorsey since he was seven years old through living in the same neighborhood and through her job at City Springs Elementary School, where she worked both as a volunteer and as clerical staff. ECF No. 11 at Ex. 5, pp. 66 – 67. Cannimore testified that she also knew Dorsey's family and that they lived in the two-hundred

block of Ballou Court, across from where she lived. *Id.* at pp. 68 – 69. She further testified that she knew Dorsey's mother, Marie, well and that she ran a day-care center from her home. *Id.* at p. 70. Additionally, Cannimore testified that she knew Dorsey's younger brother Gregory. *Id.*

Cannimore had known Raymond Savoy for approximately five years prior to the day of the shooting. *Id.* at p. 71. Cannimore saw Savoy coming from his mother's house and testified she was talking to him about her son. *Id.* at p. 73. The conversation began at Cannimore's front steps and continued as the two walked to Caroline Street, where Savoy hoped to catch a bus. *Id.* at pp. 74 -76. Cannimore testified she was standing approximately three and a half to four feet away from Savoy when Dorsey came out of Ballou Court, stopped, said "psst psst," and, when Savoy turned around to face Dorsey, pulled a gun out of his sleeve, and shot Savoy. *Id.* at pp. 78 – 79. Cannimore further testified that Dorsey fired the gun multiple times and that she had an unobstructed view of both Dorsey and Savoy. *Id.* at pp. 80 – 81. Cannimore described the gun as an automatic and stated that when the gun stopped firing, Dorsey continued "clicking" the gun. *Id.* at pp. 82 – 83. She testified that Dorsey looked at her and left. Cannimore described her state of mind as fearful and said she stood where she was and screamed. *Id.* at p. 84. Shortly thereafter, she ran from the scene because she did not "want to see that baby laying there dead like that." *Id.* at p. 85. She admitted she did not talk to the police[1] until one month later[2] because she was scared, as Dorsey was "still on the loose" and would have no problem killing her since he had already killed Savoy. *Id.* at p. 91.

Cannimore further testified that she had witnessed the shooting of Dorsey's younger brother Gregory Jackson, known as "Peanut," on August 20, 2004. *Id.* at p. 92. She testified that

---

[1] Cannimore also identified Dorsey in a photographic array shown to her by Homicide Detective Mike Hammel. She testified that she chose Dorsey's picture because "Marvin was the one shot (sic) Ray-Ray." *Id.* at pp. 86 -  87.

[2] Cannimore spoke to police December 1, 2004. *Id.* at p. 98; Ex. 6 at p. 118.

Savoy was present at the scene when Peanut was shot, but did not actually shoot him. *Id.* Cannimore said there were also other people present with whom Savoy associated when Peanut was shot and that Dorsey, who was also present, ran away after the shooting. *Id.* at p. 93. She testified that the first time she saw Savoy in the neighborhood again after that shooting was the day he died. *Id.*

Veronica Saunders was the third eyewitness to testify. She testified that she had known Dorsey for five or ten years and also knew Savoy. *Id.* at pp. 114 – 15. Saunders stated she knew Dorsey because she used heroin and cocaine and had purchased drugs from Dorsey. *Id.* at p. 115. On October 27, 2004, Saunders testified that she was on Caroline Street near Dallas Court after going to the house of a woman who sold loose cigarettes. *Id.* at p. 117. Saunders testified she was standing near a wall and observed Savoy in the same area; she also said there were a lot of people standing around. *Id.* at p. 119. Saunders was paying particular attention to Savoy because she had just finished talking to him when Dorsey approached. *Id.* at p. 137. She indicated that Dorsey came up, said "psst," and when Savoy turned around, Dorsey started shooting him. *Id.* at pp. 119 – 22. Saunders estimated that Dorsey shot Savoy between six and eight times and that she ran away because she was scared. *Id.* at p. 122. Saunders admitted that at the time of the shooting she did not want to talk to the police and that she was "messed up in the head," meaning she was hysterical and emotional after witnessing the shooting. *Id.* at pp. 124 - 25. When she spoke to the police, Saunders identified Dorsey in a photographic lineup as the man who shot Savoy. *Id.* at pp. 126 – 28. Saunders admitted during her direct testimony to two prior theft convictions and a conviction for distribution of controlled dangerous substance. *Id.* at p. 129. On cross-examination, Saunders admitted she was using heroin and cocaine on a daily basis at the time of the offense. *Id.* at p. 131.

Karen Sullivan, a firearms examiner for the Baltimore City Police Department, testified regarding her examination of the cartridge casings and metal fragments recovered at the scene of the October 27, 2004, shooting. ECF No. 11 at Ex. 6, pp. 13 – 33. She testified that the eight cartridge cases recovered at the scene were .45 caliber and were all fired from the same gun. *Id*. at p. 25. The bullets recovered from Savoy's body were also examined by Sullivan and determined to be .45 caliber bullets. *Id*. at p. 28. Sullivan testified that both the cartridge cases recovered at the scene and the bullets recovered from Savoy's body had been fired from the same gun. *Id*. at pp. 32 - 33. Sullivan brought a prop gun with her to court and used it as an aid in explaining the process of firearm identification, operability, and comparison to the jury. *Id*. at p. 13. Defense counsel did not object to the use of the prop and centered cross-examination on the possibility that the type of gun that was used would not continue to fire once the bullets were gone as an attempt to discredit Cannimore's testimony that Dorsey kept pulling the trigger after the gun was empty, causing a clicking noise. *Id*. at pp. 33 – 48.

Detective Michael Hammel of the Homicide Section for the Baltimore Police Department testified during the prosecution's case in chief. He was assigned as the lead detective to investigate Savoy's homicide. ECF No. 11 at Ex. 6, p. 109. Through Hammel's testimony it was established that Dorsey's mother lived in a house located about 40 feet from the site of the shooting where she runs a day-care center. *Id*. at p. 114 - 16. Hammel related that he was familiar with the shooting involving Dorsey's brother and he testified that, when that occurred, he went to the house where Dorsey's mother lived, went upstairs to one of the bedrooms, and found Gregory Jackson (aka Peanut) lying on his bed. Hammel further testified that when he looked out of the window in that bedroom, he had an unobstructed view of the area that became the place where Savoy was shot, approximately 80 to 90 feet away. *Id*. at pp. 116 – 17. Without

objection by defense counsel, the medical records regarding treatment of Gregory Jackson following his gunshot wound were moved into evidence. *Id*. at pp. 119 – 20.

At the end of the State's case, Dorsey was advised of his right to testify and waived that right. *Id*. at pp. 121 – 125. There were no witnesses called on behalf of the defense. *Id*. at p. 125. The jury was charged and returned a verdict of guilty on first-degree murder, use of a handgun in a crime of violence, and carrying a handgun. Prior to sentencing, the court addressed a request Dorsey made to discharge trial counsel. *Id*. at Ex. 8, pp. 2 - 12. After questioning Dorsey, determining his education level, and explaining that the sentencing proceeding would not be postponed for purposes of allowing counsel to withdraw and the public defender's office to enter an appearance, Dorsey indicated he wanted counsel to remain in the case. *Id*. at p. 11. Dorsey was sentenced to life in prison for the murder conviction plus a consecutive twenty-year term for use of a handgun in a crime of violence; the first five years of the twenty-year term were to be served without parole; the carrying offense merged. *Id*. at pp. 24 – 25.

In his direct appeal to the Maryland Court of Special Appeals, Dorsey claimed the trial judge erred when she denied Dorsey's request to discharge privately retained trial counsel at sentencing and that he received ineffective assistance of counsel at trial when his attorney failed to object to the prosecutor's comments during rebuttal argument. *Id*. at Ex. 9. With respect to the first asserted error, Dorsey argued that the trial judge's statement that sentencing was going to proceed despite his stated desire to discharge counsel was improper because she did not ask Dorsey why he wished to discharge counsel. ECF No. 11 at Ex. 9, pp. 6 – 21. He further asserted it was error for the trial judge to state that the judge to whom Dorsey's letter regarding discharge of counsel was sent was responsible for ruling on his request, and that it had been denied. *Id*. at p. 19. With respect to the second asserted error, Dorsey claimed the prosecutor's

statement during rebuttal argument that "[i]f you think he did it, you're satisfied beyond a reasonable doubt" was objectionable because it lowered the State's standard of proof. *Id*. at pp. 21- 26. He further alleged it was ineffective assistance of counsel when defense counsel failed to object and that no reasonable trial strategy would encompass the failure to object to the statements made. *Id*. at pp. 26 - 28.

In an unreported decision, the Court of Special Appeals held that Maryland Rule 4-215(e), governing discharge of an attorney, only applies "'up to and including the beginning of trial, but not after meaningful trial proceedings have begun.'" ECF No. 11 at Ex. 11, p. 5 (quoting *State v. Brown*, 342 Md. 404 (1996)). The appellate court explained that the purpose of the rule was to prevent eleventh-hour requests made as "trial tactics 'to delay the proceedings or to confuse the jury.'" *Id*. (quoting *Brown*, 342 Md. at 415). The court further found that the trial judge acknowledged receiving the letters Dorsey wrote in which he described his "discourse with counsel" and that the judge engaged in a dialogue with Dorsey regarding his request. ECF No. 11 at Ex. 11, p. 8. The court noted that, "[u]ltimately, the judge gave appellant the option to have counsel represent him during the proceeding or to continue *pro se*." *Id*. The court concluded that denial of Dorsey's request to discharge counsel was a proper exercise of the trial court's discretion supported by the proper inquiry. *Id*. at p. 9. Dorsey's petition for writ of certiorari to the Maryland Court of Appeals was denied. *Id*. at Ex. 12 and 13.

In his petition for post-conviction relief, Dorsey alleged trial counsel was ineffective by (1) failing to comply with the rules of discovery requiring that the State be provided timely notice of intent to call an alibi witness and depriving Dorsey of the opportunity to call his mother as an alibi witness; (2) failing to seek a plea offer commensurate with counsel's understanding of negotiations with the State of an agreed sentence of life with all suspended but thirty years;

(3) failing to apprise Dorsey of the status of the plea offer, failing to seek a more lenient sentence from the court, and invoking the court's prejudice by describing Dorsey as a "hard-head"; and (4) failing to file a motion in limine to exclude impeachable offenses from consideration at trial.[3] ECF No. 11 at Ex. 14, pp. 1 – 5. In his amended petition, Dorsey alleged that trial counsel was ineffective when he failed to investigate or locate witnesses who would have provided an alibi defense for him; failed to object to Dorsey being required to stand up in front of the jurors so they could see his eyes; failed to object to the firearms expert using a model handgun; failed to zealously cross-examine key witnesses who provided conflicting testimony about the number and identities of people present at the crime scene; and failed to move for judgment of acquittal with particularity. Dorsey further alleged that the cumulative effect of the alleged errors amounted to ineffective assistance of counsel. *Id.* at Ex. 15, pp. 3 – 10.

A post-conviction hearing was held on July 14, 2010, in the Circuit Court for Baltimore City, Judge Timothy J. Doory presiding. *Id.* at Ex. 16. Dorsey was represented by counsel provided by the Office of the Public Defender at the hearing. Dorsey testified at the hearing and claimed his defense counsel came to see him once before the trial, never provided him with the discovery material he received from the State, and did not call any of the three witnesses he asked him to call. Dorsey further testified that the three witnesses he wanted to call were his mother, his brother, and Lakia Farmer, who would testify Dorsey was not in the area of the shooting.[4] Dorsey maintained that his brother did not know who shot him or why, which refuted the State's theory that Dorsey shot Savoy out of retaliation. ECF No. 11 at Ex. 16, p. 29. He

---

[3] Dorsey, through counsel, withdrew the issue regarding the plea negotiations at the post-conviction hearing. ECF No. 11 at Ex. 16, p. 6.

[4] Dorsey proffered that his brother and his mother would testify that Dorsey was not in his mother's house and that Lakia Farmer would testify that he was with her at the mall buying Halloween costumes for the kids at the time of the shooting. ECF No. 11 at Ex. 16, pp. 39 – 40.

explained that he had attempted to contact defense counsel several times, but counsel never got back to him. He told counsel about his witnesses on the day he went to court for trial, but trial was postponed because Judge Glynn could not hear the case. *Id*. at pp. 25 – 31. Dorsey also related that his trial counsel told him that if Dorsey's mother was called as a witness, the State would argue that she would say whatever she needed to say to have him acquitted and that was the reason she should not be called as a witness. *Id*. at pp. 34 – 35. When testifying that counsel did not communicate the State's offer of a plea bargain, Dorsey testified that he was not interested in taking the deal because he did not commit the crime. *Id*. at p. 36. Dorsey then explained that he would have taken a plea deal that limited the amount of time he had to serve to five to ten years. *Id*. at p. 37.

On cross-examination of Dorsey, it was established that he did not tell trial counsel about his alibi witnesses until after he heard witness testimony stating that Dorsey had been in his mother's house at the time of the shooting. In addition, it was established that Dorsey had been in court on six occasions with his attorney and did not tell him about alibi witnesses and that he was aware of the date the shooting was alleged to have taken place on the date of his arrest. ECF No. 11 at Ex. 16, pp. 55 – 66.

In the decision denying post-conviction relief, the court first found that it appeared from the record that the trial court was amenable to allowing Dorsey's mother to testify on his behalf because her name was included on a witness list submitted and she was listed among the potential witnesses during the voir dire of the jury. ECF No. 11 at Ex. 17, p. 6. Additionally, the post-conviction court found that trial counsel's later failure to call Dorsey's mother as an alibi witness was a valid trial tactic and was due in part to the fact that Dorsey did not inform counsel of his desire to call his mother as a witness until just before trial started. Consequently, counsel

was unable to interview Dorsey's mother prior to trial. Counsel testified that he would never "call a witness --- particularly an alibi witness --- that he had not had the opportunity to interview." *Id.* The post-conviction court further found that calling Dorsey's mother as a witness would have provided the State with an opportunity to argue she was saying what she had to say to save her son from incarceration. *Id.* The post-conviction court concluded that Dorsey had failed to meet his burden under *Strickland v. Washington,* 446 U.S. 668 (1984), because the failure to call the alibi witness did not constitute defective performance. *Id.* at p. 7. In Dorsey's related claim that the failure to provide notice of alibi testimony deprived him of the opportunity to testify on his own behalf to corroborate the alibi, the post-conviction court found that Dorsey was "free to take the stand and offer his own alibi defense, without the necessity of his mother's corroborating testimony." [5] *Id.*

With regard to Dorsey's claim that trial counsel failed to pursue a better plea deal, the post-conviction court found no deficiency because the court was not convinced Dorsey would have taken any plea offer "since he continued to maintain that he was not the perpetrator of the crime." *Id.* at p. 9. Additionally, the post-conviction court noted that the initial plea offer had been life, with all but fifty years suspended, and that it had been reduced to life, with all but forty years suspended, leading the court to infer that the State did reduce its offer. The post-conviction court further rejected Dorsey's claim that counsel's description of him as a "hard head" was in any way prejudicial. "Trial Counsel was merely describing his client as one who was inclined to stick with his proposed course of action – namely, rejecting any plea agreement that included the possibility of jail time." *Id.* at pp. 9 – 10.

---

[5] The post-conviction court noted that it was "not convinced by [Dorsey's] self-serving assertion that he intended on taking the stand in his own defense." ECF No. 11 at Ex. 17, p. 8.

The post-conviction court found that Dorsey's claim that counsel was ineffective for failing to investigate alibi witnesses was not supported by either the trial transcript or credible evidence at the post-conviction hearing. The court observed that Dorsey provided conflicting testimony at the hearing, claiming counsel never visited him in jail making it impossible for Dorsey to tell counsel about three alibi witnesses until the date of trial, and later claiming he told counsel about using his girlfriend as an alibi witness during a visit with counsel in the jail. ECF No. 11 at Ex. 17, p. 11. In addition, counsel testified that he did not recall Dorsey mentioning any alibi witnesses prior to the date of trial, and when he did so, he indicated he wanted to call his mother, not his girlfriend, as an alibi witness. *Id*. The post-conviction court then denied the allegation of error.

Dorsey's claim that it was ineffective assistance of counsel for trial counsel to fail to object to his being directed to stand before the jury so they could see his eyes was also rejected by the post-conviction court. Dorsey asserted that standing before the jury "made him look guilty . . . in what he alleges to be an awkward, guilt-ridden context, he was cloaked in the taint of guilt [*sic*]." *Id*. at p. 11. The post-conviction court stated it was not aware of any "legal authority that would prohibit a defendant from being made to stand in such a position where the jury could clearly view any distinguishing physical characteristics, such as his eyes." *Id*. at pp. 11 – 12. The post-conviction court further relied on a Maryland Court of Special Appeals decision, holding that it was not error to require a defendant to exhibit his forearm to the jury after a witness testified she could identify him because of his distinctively muscular forearm, to reject Dorsey's claim of error in counsel's failure to object. *Id*. at p. 12 (citing *Doye v. State*, 16 Md. App. 511, 524 (1973)). The post-conviction court noted that Dorsey's assertion that he

"was somehow 'cloaked in the taint of guilt' is simply nonsense without any legal support whatsoever" and concluded the failure to object was not deficient. ECF No. 11 at Ex. 17, p. 12.

The post-conviction court found no deficiency in counsel's failure to object to the use of a prop handgun by the firearms expert who testified at trial. The court noted that "[d]emonstrative evidence is usually offered to help the fact finder to understand a witness's testimony and is 'not required to be original or authentic.'" *Id*. (quoting *Andrews v. State*, 372 Md. 1, 20 (2002)). The trial transcript "makes it clear that the model handgun was . . . a prop, and not the actual handgun used to commit the murder." ECF No. 11 at Ex. 17, p. 13. The post-conviction court noted that the only purpose of the prop handgun was "to help the firearms expert illustrate the processes by which a bullet is fired from a weapon and how that process is used to facilitate firearms identification." *Id*. Concluding that counsel's failure to object to the use of the prop was not ineffective assistance of counsel, the post-conviction court stated that Dorsey "fails to explain how the admission of the model handgun as demonstrative evidence could have prejudiced [him]." *Id*.

With respect to Dorsey's claim that trial counsel was ineffective when he failed to argue with particularity on a motion for judgment of acquittal, the post-conviction court observed that Md. Rule 4-324(a) provides in part that "[t]he defendant shall state with particularity all reasons why the motion [for acquittal] shall be granted." *Id*. at p. 15. The post-conviction court reasoned that, assuming counsel's performance was deficient when he submitted on a general motion for judgment of acquittal, Dorsey would still have to prove he was prejudiced by the error. *Id*. A motion for acquittal must be denied if a trial judge finds "any relevant evidence that is legally sufficient to sustain a conviction" and "the evidence must go before the fact finder." *Id*. (citing *Brooks v. State*, 299 Md. 146, 150 (1984)). In viewing the evidence, the trial court is

required to view the evidence "'in the light most favorable to the prosecution' to determine whether 'any rational trier of fact could have found the essential elements of the offense of the crime beyond a reasonable doubt.'" ECF No. 11 at Ex. 17, p. 15 (quoting *Sparkman v. State*, 184 Md. App. 716 (2009)). The post-conviction court then concluded that, in Dorsey's case, "the State presented ample evidence from which the jury could conclude that [Dorsey] murdered the victim." ECF No. 11 at Ex. 17, p. 15. After reviewing the evidence presented against Dorsey, the post-conviction court observed that a motion for judgment of acquittal would have been denied as there was ample evidence upon which a reasonable juror could convict Dorsey of first-degree murder beyond a reasonable doubt. *Id*. at p. 16. The post-conviction court then rejected Dorsey's claim that cumulative errors constituted ineffective assistance of counsel, having found no error in trial counsel's performance. *Id*.

Dorsey filed an application for leave to appeal the post-conviction court's denial of relief with the Maryland Court of Special Appeals. ECF No. 11 at Ex. 18. The application was denied without opinion on April 12, 2012. *Id*. at Ex. 19.

Dorsey now presents several grounds for relief. He claims trial counsel was ineffective by failing to provide timely notice of an alibi witness; failing to investigate and locate alibi witnesses; failing to cross-examine witnesses zealously; failing to object to Dorsey's being required to stand before the jury for visual inspection; and failing to object to a firearms examiner's using a prop handgun during testimony. In addition, Dorsey claims the Maryland Court of Special Appeals erred when it denied his claim of ineffective assistance of counsel on direct appeal. ECF No. 1. Dorsey later filed an amended petition seeking to add a claim that the prosecution withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). ECF No. 7. Dorsey admits this claim has not been exhausted and that respondent was

not required to respond to the allegation by the show cause order issued in this case.  ECF No. 14.  He nevertheless seeks review of the claim without requiring exhaustion because he suggests an attempt at exhausting State remedies with regard to the claim would be a futility.  *Id.*  The exculpatory evidence at issue is a statement by a witness, describing a suspect who does not match Dorsey's physical appearance, which Dorsey has not submitted to this court for review.

## Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States.  *See* 28 U.S.C. § 2254(a).  The federal habeas statute, 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating State-court rulings" *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).  This standard is "highly deferential" and "difficult to meet." *Cullen v. Pinholster*, 563 U.S. __, ___, 131 S.Ct. 1388, 1398 (2011); *Harrington v. Richter*, 562 U.S_, ___131 S. Ct. 770, 786 (2011).

A federal court may not grant a writ of habeas corpus unless the State's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d).   A State adjudication is contrary to clearly established federal law under  § 2254(d)(1) where the State court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "State court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the State court's decision." *Harrington*, 131 S.Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a State-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, _U.S. _, 130 S.Ct. 841, 849 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the State court decision was based on an unreasonable determination of the facts. *Id*. "*[A] a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant State-court decision applied established federal law erroneously or incorrectly.*" *Renico v. Lett,* _ U.S_, 130 S. Ct. 1855, 1862 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the State court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the State court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where State courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

## Analysis

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id.* at 696.

As the Supreme Court held in *Strickland*, "a State court conclusion that counsel rendered effective assistance of counsel is not a finding of fact binding on the federal court to the extent stated by [former] 28 U.S.C. § 2254(d)[ now § 2254(e)(1)]." *Id.* at 698. Rather, "although State court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254[(e)(1)], . . . both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* It follows, then, that new § 2254(d)(1) applies to the State court's conclusion that the petitioner's trial counsel rendered effective assistance of counsel and this Court may not grant relief on this claim as long as the State court denied the claim based on a reasonable application of the *Strickland* standard to the facts presented in the State court proceeding.

Dorsey's first claim in this court is that trial counsel rendered ineffective assistance of counsel by failing to comply with Maryland Rule 4-263, requiring defense counsel to provide notice of an alibi witness. ECF No. 1 at p. 11. He asserts this error prevented him from calling his mother as an alibi witness. *Id.* The post-conviction court's reasoning in rejecting this claim

is unassailable. The post-conviction court's factual finding that conflicting testimony was provided regarding when counsel was informed of a possible alibi defense and, based on that fact, its conclusion that counsel was not deficient, was a reasonable application of the *Strickland* standard. In his petition before this court, Dorsey states that the trial court would have permitted counsel to call his mother as a witness because her name was included in the list of potential witnesses used for jury voir dire, thus negating any failure by counsel not to provide prior notice. ECF No. 1 at p. 13. Dorsey's testimony provided at the post-conviction hearing was confusing at best. He indicated his girlfriend would have testified he was with her at a shopping mall at the time of the shooting and that his mother would have testified he was not at her house at the time of the shooting. He admitted that his attorney's advice that the State would have used an argument that his mother was biased and would say whatever she had to say in order to keep her son out of jail was, in his opinion, good advice at the time. The asserted ground for habeas relief shall be denied.

Dorsey also alleges counsel was ineffective by failing to investigate and locate alibi witnesses. ECF No. 1 pp. 18 – 24. Dorsey claims that trial counsel's real reason for not investigating his alibi witnesses was his belief that Dorsey's mother would lie on the witness stand in order to protect her son. Even assuming that counsel's advice regarding the bias argument meant what Dorsey claims, counsel has an ethical duty not to suborn perjury. The advice provided, however, pertained to the lack of persuasiveness of having Dorsey's mother testify on his behalf. The post-conviction court reasonably concluded, based on the evidence before it, that counsel was not provided information regarding an alibi in sufficient time to prepare witnesses for trial. The asserted deficient performance is without merit and does not warrant habeas relief.

Dorsey also claims trial counsel was ineffective based on the cumulative errors alleged. ECF No. 1 at pp. 36 – 38. He requests that this court "consider the claims of ineffective counsel collectively to determine the cumulative effect and prejudice they had on petitioner's trial and appeal." *Id*. at p. 38. As observed by the post-conviction court, "[w]here there are no errors, the Court is dealing solely with a compilation of zeros." ECF No. 11 at Ex. 17, p. 16 (citing *Gilliam v. State*, 331 Md. 651, 686 (1993)). The post-conviction court's application of *Strickland* to the facts of the case with regard to this claim was reasonable and the court's view that "[w]hen viewed in its entirety, trial counsel's actions were either not deficient or not prejudicial" forecloses a finding of cumulative constitutional errors. ECF No. 11 at Ex. 17, p. 17. Dorsey has failed to allege sufficient grounds for relief under 28 U.S.C. § 2254(d).

## Procedural Default

Where a petitioner has failed to present a claim to the highest State court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal, or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478, 489-91 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U.S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief). A procedural default also may occur where a State court declines "to consider the merits [of a claim] on the basis of an adequate and independent State procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999).

As the Fourth Circuit has explained:

If a State court clearly and expressly bases its dismissal of a habeas petitioner's claim on a State procedural rule, and that procedural rule provides an independent

> and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim. *See Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). A procedural default also occurs when a habeas petitioner fails to exhaust available State remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id*. at 735 n.1.

*Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).

If a procedural default has occurred, a federal court may not address the merits of a State prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits, or (2) that failure to consider the claim on the merits would result in a miscarriage of justice, *i.e.*, the conviction of one who is actually innocent.[6] *See Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Breard*, 134 F.3d at 620. "Cause" consists of "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim in State court at the appropriate time." *Id*. (quoting *Murray*, 477 U.S. at 488). Even where a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U. S. 298, 314 (1995).

The following claims raised by Dorsey in the instant petition were not raised in his application for leave to appeal the denial of post-conviction relief and are procedurally defaulted: that counsel was ineffective for failure to zealously cross-examine key witnesses, failure to object to Dorsey being presented to the jury to observe his physical appearance, and failure to

---

[6] Habeas petitioners may use an actual innocence claim to excuse the procedural default of a separate constitutional claim upon which they request habeas relief. *See Murray v. Carrier*, 477 U.S. at 496. "[When] a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id*.; *see also Reid v. True*, 349 F.3d 788, 806 (4th Cir. 2003). Petitioners who wish to use a claim of actual innocence as a gateway to raising an otherwise defaulted constitutional claim must demonstrate by a preponderance of the evidence that a reasonable juror could not have convicted the petitioner in light of the new evidence. *See Buckner v. Polk*, 453 F.3d 195, 199-200 (4th Cir. 2006).

object to the use of a prop handgun by the firearms expert. ECF No. 1 at pp. 25 – 30; 31 – 33; and 33 – 35. Dorsey admits in his reply that none of these claims were presented on appeal, but argues they should be considered exhausted because he is prohibited from seeking post-conviction relief again. ECF No. 14 at pp. 6 – 10. Dorsey relies on *George v. Angelone*, 100 F.3d 353, 363 (4th Cir. 1996), to support his argument that he is entitled to review of the defaulted claims. His reliance is misplaced. *George* dealt with a habeas petitioner who failed to present a claim in his post-conviction petition and was barred under Virginia law from bringing a successive petition "if the facts as to that claim were known or available to petitioner at the time of his original petition." *George*, 100 F.3d at 363. In the instant case, Dorsey raised the claims in his post-conviction petition, but failed to raise them in his application for appeal. He was not barred from appealing the denial of post-conviction relief on the grounds asserted before the post-conviction court. Dorsey offers no cause and prejudice to excuse the default, nor does he assert an actual innocence claim. *See Gray v. Netherland*, 518 U.S. 152, 162 (1996) (federal habeas corpus review is unavailable on defaulted claim, unless petitioner can demonstrate cause and prejudice for default). Accordingly, the asserted grounds are not subject to substantive review by this court.

### *Brady* claim

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675 (1985). In order to prevail on a *Brady* claim, it must be established that the

evidence at issue is both favorable to the defense and that the unavailability of the evidence calls into question the result of the trial. *Id*. at 678. The Supreme Court has made it clear that there is no distinction between exculpatory evidence and impeachment evidence in the context of a *Brady* analysis. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). There is no requirement that the guilty finding must be overturned unless suppression of the impeachment evidence so limited the defense's ability to cross-examine an accusing witness that "its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678.

Dorsey filed an amendment to his petition alleging the prosecutor failed to disclose exculpatory evidence to the defense. ECF No. 7. He alleges this claim was raised in a petition for writ of actual innocence in the Circuit Court for Baltimore City and the writ was denied, prohibiting him from raising it again. ECF No. 14 at p. 12. He states he received documents through a Maryland Public Information Act request on January 3, 2009, which included a redacted witness statement from a bail bondsman who identified another suspect described as 6'1" and 230 to 250 pounds, with a beard, mustache, and medium complexion who was wearing a baseball cap and gray hooded sweatshirt. *Id*. at p. 13. The witness further stated that the suspect got into a black Escalade with chrome wheels. *Id*. Dorsey claims this statement is *Brady* material which was not provided to the defense. *Id*. Dorsey further states that the alleged exculpatory document was provided to post-conviction counsel prior to the hearing, but the claim was not raised. *Id*. He urges this court to consider the claim exhausted because he has no further avenues to raise the claim in State court. *Id*. Respondents have not waived the exhaustion requirement with respect to this claim.

It is not clear that the document referenced by Dorsey is actual *Brady* material, nor is it clear that had the document been available to the defense at the time of trial it would have had a

significant impact on the outcome of the trial. Dorsey was convicted on overwhelming evidence of eyewitnesses, one of whom had known him since he was a child, was speaking with the victim at the time he was shot, and saw Dorsey shoot Savoy. Dorsey admits this claim has not been exhausted despite his possession of the alleged document at the time of the post-conviction proceeding; the *Brady* material was not raised in Dorsey's pro se petition for post-conviction relief. Given the circumstances, this court finds that granting stay and abeyance to allow Dorsey to attempt to re-open post-conviction proceedings for consideration of this claim is not appropriate because the evidence would not have had a significant effect on the result of the trial and because Dorsey has not shown good cause. *See Rhines v. Weber*, 54 U.S. 269, 277 (2005) (stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims in State court). The claim will accordingly be dismissed without prejudice and respondent will not be required to file an answer regarding this claim.

### Certificate of Appealability

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet this burden, an applicant must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)). Dorsey has failed to make a substantial showing he was denied a constitutional right, and this court finds that reasonable jurists would not find the denial of habeas relief in this case debatable. A certificate of appealability shall therefore not be issued.

A separate order shall be entered in accordance with this memorandum.


DATED this <u>9th</u> day of May, 2013.

BY THE COURT:


_____/s/_____
James K. Bredar
United States District Judge